RANDY GROSSMAN
United States Attorney
VALERIE H. CHU
Assistant U.S. Attorney
California State Bar No. 241709
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 546- 6750
Attorneys for United States of America

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No.  21CR1275-DMS |
|---|---|
| v. | |
| | UNITED STATES' SENTENCING MEMORANDUM |
| RONALD JAMES GREEN, | |
| Defendant. | Date: February 10, 2023 |
| | Time: 9:00 AM |

# I

# INTRODUCTION

Imagine learning that doctor believes that you need a crucial and customized pharmaceutical medication to relieve your pain.  A patient in that position may feel anxious, fearful, or stressed.   She turns to the health care system, trusting that the medical professionals she encounters are acting entirely – and solely -- in her best interest.  She expects that treatments and medications are recommended because they are necessary to restore her to good health, and is relieved when a compound pharmacy comes to the rescue to concoct and deliver this vital specially-customized medical treatment.

Defendant Ronald James Green and his co-conspirators turned this expectation on its head.  Instead of waiting for doctors to decide what medications a patient needed, he and others "reverse-engineered" the TRICARE fee schedules to identify which drug components would be reimbursed at the highest levels, and then assembled expensive and

medically unnecessary compounded medication formulations, using those expensive ingredients, that would be paid for by TRICARE.  For his part, Defendant edited pre-printed prescription pads with the new formulations, and then distributed those new prescription pads to marketing organizations, knowing and expecting that telemedicine doctors would select and sign prescriptions for those novel formulations, irrespective of medical necessity.

To his credit, when confronted, Defendant accepted responsibility and opted to cooperate with law enforcement.  He has also paid in full the restitution amount allocated to him.  The United States therefore joins the Probation Officer's recommendation of 5 years of Probation.

## II

### STATEMENT OF THE CASE

#### A. PRIOR PROCEEDINGS

On May 25, 2021, Defendant pleaded guilty to a one-count information charging healthcare fraud, in violation of 18 USC § 1347.

#### B. THE SCHEME TO DEFRAUD

Defendant and others engaged in a scheme to commit healthcare fraud through the submission of false and fraudulent claims to the TRICARE Program. The scheme began at least in or around January 2015 and continued through to at least on or about June 29, 2015. While Defendant was always aware of the high probability that the healthcare fraud scheme was unlawful, he deliberately avoided learning the truth until approximately May 1, 2015, and thereafter knowingly participated in the scheme through approximately June 1, 2015.

The scheme in which Defendant participated involved the submission of false and fraudulent claims to TRICARE for expensive and medically unnecessary pain creams, scar creams and multi-vitamins, which were billed through Brookhaven Specialty Pharmacy, LLC. ("Brookhaven"), and other pharmacies.  At the time, Defendant worked for NHS Pharma, Inc. ("NHS").

In furtherance of the scheme, Defendant and others caused compounding pharmacies, including Brookhaven, to make false and fraudulent claims on TRICARE and other payers for medically unnecessary compounded medications that were dispensed pursuant to false and fraudulent prescriptions obtained through a system of illegal health care kickbacks. Brookhaven and other compounding pharmacies paid NHS millions of dollars in illegal kickbacks and other remuneration in exchange for the referral of the false and fraudulent prescriptions for compounded medications belonging to TRICARE beneficiaries. Specifically, Brookhaven and other pharmacies paid NHS approximately 55% of the amount received from health care benefit plans including TRICARE, for each prescription referred to the pharmacies by NHS. NHS in turn paid a portion of this sum as a kickback to SKR Services, a so-called "marketing" company located in Florida, in exchange for, and as a further inducement to those organizations to, refer prescriptions for compounded medications for beneficiaries of health care benefit programs including TRICARE. TRICARE and other payers often reimbursed compounding pharmacies including Brookhaven thousands of dollars for a 30-day supply of a compounded pain or scar cream for one beneficiary.

In furtherance of the scheme, members of the conspiracy developed compounded medication formulations for the primary purpose of inflating the amount of money TRICARE would reimburse to Brookhaven, and to correspondingly increase the amount of kickbacks and remuneration that NHS and its affiliated marketers would receive. Defendant and others executed this scheme, for example, by using billing data to run "test claims" designed to identify high paying components which the other members of the conspiracy in turn assembled into expensive and medically unnecessary compounded medication formulations paid for by TRICARE and other health care benefit plans. Once identified and assembled, members of the conspiracy directed Defendant to edit the formulations on the pre-printed prescription pads reflecting the new formulations, and Defendant and others at NHS dispensed the prescription pads to marketing organizations

including SKR that subsequently caused telemedicine physicians to ratify them irrespective of medical necessity. Additionally, members of the conspiracy perpetuated the health care fraud scheme by falsely waiving insurance co-payment collection requirements, and after Defendant became aware of the fraudulent nature of the waivers, Defendant continued participating in the entirety of the scheme in the manner described above.

Defendant's knowing participation in this health care fraud scheme resulted in TRICARE's payment of false and fraudulent claims to Brookhaven of at least $313,039. As a result of calculations concerning the other individuals responsible for the same loss, the United States determined that Defendant's share should be $26,085.58. Agents of Defense Criminal Investigative Service have confirmed that TRICARE has received that amount via wire transfer from Defendant.

## II

## UNITED STATES' SENTENCING RECOMMENDATION

### A. GUIDELINES CALCUALTIONS

The United States recommends the following calculations from the United States Sentencing Commission, Guidelines Manual ("Guidelines" or "USSG"):

| | | |
|---|---|---|
| 1. | Base Offense Level [USSG § 2B1.1] | 6 |
| 2. | Actual loss $ 2,500,000 to $550,000 [USSG § 2B1.1(b)(1)(G)] | +12 |
| 3. | Minor Role [§3B1.2] | -2 |
| 4. | Combination of Circumstances [§5K2.0 / 3553(a)] | -2[1] |
| 5. | Acceptance of Responsibility [§3E1.1] | -3 |

---

[1] Parties agree that a departure is warranted for a combination of circumstances, including Defendant's expeditious resolution of the case during a time of unprecedented strain on the court system due to COVID-19 pandemic, his limited period of involvement in the fraud and comparatively minor scope of knowledge of the health care fraud scheme's workings, his pre-plea cooperation, and the relative amount that his conduct contributed to the overall loss.

6.     Substantial Assistance [§ 5K1.1]                    -2[2]

Adjusted Offense Level                                          9

At Adjusted Offense Level 9 and Criminal History Category I (PSR ¶ 43), Defendant faces a sentencing range of 4 to 10 months.

## B. APPLYING THE § 3553(A) FACTORS

On balance, the United States believes that a slight variance from the Guidelines sentence is appropriate to address the § 3553(a) factors for Defendant.  After applying those factors, the United States submits that a sentence of 5 years' Probation is appropriate.

### 1.     Nature and Circumstances of the Offense and History and Characteristics of the Defendant [3553(a)(1)]

The nature and circumstances of the offense are aggravated.  Defendant and his co-conspirators took advantage of a government benefit program designed to provide necessary medical care to servicemembers and their families, to ensure a fit and ready fighting force to defend our nation's freedoms.  Crimes like this drain government programs of precious funds, undermine support for social safety nets, and increase the costs of health care for all Americans.

It is especially troubling that this is an arena in which patients are invariably at a disadvantage, in terms of information and education.  Since their health and lives are at risk, patients trust the educated and knowledgeable professionals around them.  In this case, those professionals recommended expensive compound medications, and conveniently, a pharmacy like Brookhaven was able to fill them – because it was paying NHS, which paid marketers like SKC, who paid telemedicine doctors, to prescribe them.

On the other hand, in mitigation, Defendant has positive personal history and characteristics.  He has had a consistent work history, and a record of community and church service.  He had a minor role in the operations of the scheme, providing technical, sales, and marketing assistance in support of a fraud scheme largely devised by others (including family members).   He has remained compliant with pretrial release for the past

---

[2]     *See* Appendix.

18 months, and has paid his portion of the loss caused to TRICARE.  He has also made efforts to turn to other ways to make a living, after leaving the DME and medical marketing fields.

### 2.  <u>Need for the Sentence Imposed [3553(a)(2)]</u>

Defendant's sentence should reflect the seriousness of the offense and effect general deterrence.  In white collar fraud cases such as this, the need for general deterrence is paramount.  "White collar crime . . . usually requires a well-schooled, intelligent criminal . . . ."  *United States v. Edwards*, 595 F.3d 1004, 1021 (9th Cir. 2009) (Bea, J., dissenting). Because these are intelligent criminals, they can rationally assess the potential downsides of their actions.  Writing in dissent, Judge Bea starkly described the danger of a sentence that fails to adequately set an example for others, explaining:

> [F]raud, unlike an assault in a tavern or even domestic abuse, tends to be a planned, deliberate crime, which allows plenty of time for reflection, calculation of the odds of success or failure, and the ultimate decision. . . . It is precisely at this point when the thief of above-average education and wit is deciding whether to do the deed that reflection on probable prison time -- general deterrence -- can have an effect. Like the taxpayer who decides not to defraud the fisc for fear of wearing an orange jumpsuit for a long time because he knows that the government goes after everyone -- even Al Capone -- for tax fraud, the contemplating bank fraud thief should be forced to consider a message other than: 'Oh, if you get caught and you put on a repentant's suit, you'll probably get probation and a restitution order of 20% of what you stole. And about that restitution order, don't worry too much because, in America, there are no debtor's prisons. So if you don't pay, you won't do time.'

*Id.*

Health care fraud presents heightened risk for fraud, and a concomitant greater need for general deterrence. *See United States v. Edwards*, 622 F.3d 1215, 1218 (9th Cir. 2010) (Gould, J., dissenting from denial of rehearing *en banc*) ("It doesn't take a crystal ball to see that those occasional dishonest persons in the business community may make a slide-rule calculation that they can steal hundreds of thousands of dollars, maybe even millions, because if caught they see a good chance that they can walk away with expressed contrition and probation.  That is the result the Sentencing Guidelines have long worked to prevent.").

While these factors might militate in favor of a custodial sentence in a white collar case, even where the Guidelines are low, the United States submits that the permanent felony conviction, financial penalties, and lengthy period of Probation sufficiently satisfies this sentencing factor for this Defendant.

### 3.  The Kinds of Sentences Available [3553(a)(3)]

The Guidelines provide for alternatives to imprisonment, and set forth the circumstances under which such sentences may be appropriate.  Defendant's Guidelines range is in Zone B, which permits alternatives to incarceration.  In light of this, the recommended probationary sentence seems consistent with this sentencing factor.

### 4.  The Kinds of Sentences, Ranges, and Policy Statements in the Guidelines [3553(a)(4), (5)]

The United States has discussed the application of the Guidelines throughout this memorandum, and believes that its recommendation here fairly accounts for the policy considerations in the Guidelines.

### 5.  The Need to Avoid Unwarranted Sentencing Disparities [3553(a)(6)]

The Guidelines have as a principle aim the reduction of sentencing disparities, which the Supreme Court has recognized.  *See United States v. Booker*, 125 S. Ct. 738, 761, 782, 789 (2005).  In particular, concern that "white-collar offenders" received special treatment and "frequently do not receive sentences that reflect the seriousness of their offenses" was among the motivations for the Sentencing Reform Act that gave rise to the Sentencing Guidelines. S. Rep. No. 98-225 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3260. In an effort to avoid disparities, the expert Sentencing Commission reviewed nationwide sentencing practices after the passage of the Sentencing Reform Act of 1984, incorporating data drawn from 10,000 pre-sentence investigations, and used that data to craft the Guidelines.  *See* U.S. SENT'G GUIDELINES MANUAL § 1A1.1 cmt. n.3.

## C. RESTITUTION

For completeness of the record, the United States recommends that the Court order restitution in the amount of $26,085.58, and find that Defendant has satisfied this obligation in full with no further restitution owed.

## IV

## CONCLUSION

The United States respectfully requests that this Court impose a sentence of 5 years' Probation and a restitution order in the amount of $26,085.58 as indicated.

DATED: February 3, 2023                 Respectfully submitted,

RANDY GROSSMAN
United States Attorney

s/ Valerie H. Chu
VALERIE H. CHU
Assistant U.S. Attorney